******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

EVELEIGH, J., dissenting. I respectfully dissent from the majority opinion. I generally agree with the dissent authored by Chief Justice Rogers and join that dissent except to the extent that she states that the due process rights of Suzanne Listro, an employee of the named defendant, the Department of Children and Families (department), "were not violated by lack of notice . . . ."[1] I write separately because, in my view, Listro was denied her due process rights in this matter because she was never given notice that "negligence" was the basis for her termination. The fact that the arbitrator found that the department had just cause to terminate Listro because she was negligent in her care of M, her foster child, despite never giving her notice of that ground, is in direct conflict with *Board of Education* v. *Loudermill*, 470 U.S. 532, 546, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985), and *Bartlett* v. *Krause*, 209 Conn. 352, 380, 551 A.2d 710 (1988). Indeed, *Bartlett* is never cited by the parties or the Appellate Court. I respectfully dissent because Listro was never given notice that negligence was a possible ground for termination, either at or before her pretermination hearing or during the arbitration. In fact, it is clear from the record that the basis of the department's charges against Listro was that it believed that she had caused the death of M from "shaken baby syndrome" and not through any negligence. In my view, on the basis of the facts in the present case, Listro was clearly denied due process of law.

I note, at the outset, that I agree with both the facts and the standard of review set forth within the majority opinion. Therefore, I will highlight only those facts necessary for my dissent.

In *Board of Education* v. *Loudermill*, supra, 470 U.S. 546, the United States Supreme Court stated that "[a] tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story" before being terminated. An examination of the record demonstrates that the focus of the charges brought by the department against Listro was related to alleged criminal conduct. The arbitrator found that the Commissioner of Children and Families (commissioner) issued a press release explaining as follows: "Given [Listro's] arrest and the seriousness of the charges, I am seeking her termination." The commissioner did not mention the term negligence. On the basis of the foregoing, it seems that the commissioner was seeking termination of Listro's employment based upon the seriousness of the criminal charges against her. On July 18, 2008, Listro received a notice of an

investigatory meeting from the department. The letter states: "This meeting is to discuss your serious off-duty misconduct that has led to your arrest." It then proceeds to state: "If appropriate, a [predisciplinary] conference will be held immediately following the investigatory meeting. The purpose of the [predisciplinary] meeting will be to give you an opportunity to respond to any charges the [d]epartment may deem appropriate." Again there is no mention of the term "negligence." The charges relate to the off-duty conduct that led to her arrest—namely, conduct resulting in the death of a child.

After the meeting and hearing, Listro received a letter from the department notifying her that she had been dismissed. The letter reads, in part, "this action is taken immediately due to your serious misconduct which affects the public, the safety and welfare of our clients." The following explanation is set forth in the next paragraph: "On May 12, 2007, a seven month old baby was placed in your home for [f]oster [c]are. On May 19, 2008, the baby died while in your care. On July 16, 2008, you were arrested and charged with [m]anslaughter [in the] [f]irst [d]egree and [r]isk of injury to a [child]. You were afforded an opportunity to provide your version of events. You declined to provide a statement [or] answer any questions on the matter. During this meeting you were advised that your actions were deemed detrimental to the best interest of the agency and the state. You were also advised that the department would make a decision based on the information gathered without the benefit of your input." The letter continues as follows: "The arrest warrant indicates that you provided a statement reporting that [M] had fallen from the bed when you left him unattended while you ejected a tape from [a video cassette recorder (VCR)]. However, the medical examiner has deemed that the injury to [M] is not consistent with such a fall. Additionally, the [c]hild [p]rotective [s]ervices investigation on this matter has been substantiated. Your name has been placed on the [c]entral [r]egistry, meaning [the department] has deemed that you pose an ongoing risk to children. Your actions represent a violation of [§ 5-240-1a (c) (4) of the Regulations of Connecticut State Agencies]: Offensive or abusive conduct toward the public, co-workers, or inmates, patients or clients of [s]tate institutions or facilities; and [§ 5-240-1a (c) (13)]: Engaging in any activity which is detrimental to the best interest of the agency or [of] the state." Finally, the letter stated the following: "A *Loudermill* meeting was conducted immediately following the investigatory meeting. You were afforded an opportunity to provide additional [or] mitigating information and to make a statement as to why the agency should not take the action being contemplated. The information provided by your . . . representatives did not serve to mitigate our decision. As such, we have determined that your continued employ-

ment with [the department] represents an unacceptable employment risk. Accordingly, due to the seriousness of these charges you were notified on July 23, 2008, that you were dismissed effective immediately."

As the foregoing demonstrates, even in the termination letter, there is no mention of negligence. The department repeatedly stated that it was the seriousness of the criminal charges that caused her termination. The very nature of the conduct which she allegedly committed, according to the department, constituted "[o]ffensive and abusive conduct . . . ." In and of itself, this reference infers intentional, rather than negligent acts. It is, therefore, manifestly clear that Listro had no notice that the department was claiming that she was negligent and that her negligence was the cause of her dismissal.

Further, the affidavit of Neal Cunningham, staff representative for the plaintiff, AFSCME, Council 4, Local 2663 (union), states that "[n]o charge of negligence was ever made by the [department] at the *Loudermill* [hearing], nor was she ever charged with negligence in her termination letter. . . . Thus, when the issue was framed for arbitration it was based upon the allegations at the *Loudermill* [hearing] and in the termination letter."

In light of the notice provided for the hearing and the termination letter, when the arbitrator found that "the [d]epartment has failed to carry its burden of establishing that . . . Listro committed the fatal abuse of which she was accused," that should have been the end of the case. Indeed, the medical examiner established that M's fall from the bed was not consistent with the injuries resulting in M's death.[2] However, instead of ending her decision with the failure of the department to prove its case, the arbitrator espoused a view that Listro "was negligent in her care of M [and] her inattention permitted him to fall from the bed that night. Although this represents a lapse in judgment with which many parents are familiar . . . Listro's moment of negligence had unusually serious consequences, the death of a child."

If Listro had known the department was considering negligence as a ground for her termination, she could have prepared differently for the hearing and the arbitration. In fact, Listro did not testify or present evidence at the hearing because she was on notice that her criminal charges were the ground for her termination. Had she known that negligence was a ground, she may have presented expert testimony regarding whether her care of M violated any standards of care or department regulations. The arbitrator seemed to recognize the dilemma, stating in her decision that Listro's acts "represent[ed] a lapse in judgment with which many parents are familiar . . . ." This is neither a situation where Listro left the room with a child unattended, nor a

situation where a parent goes into a store leaving a child in the car. Listro remained in the room and turned her head for a short period of time to remove a tape from a VCR. This may well have been a case wherein it was necessary to have expert testimony before a decision could have been rendered regarding any negligence. Listro was never able to present such evidence regarding negligence because she was not given notice that negligence was being alleged as a ground for termination.

The majority reasons that "[i]t was not necessary for the department to cite 'negligence' as the reason, or an alternative reason, for Listro's dismissal." I respectfully disagree. In my view, this statement is completely at odds with the requirements of due process. The majority does cite to two federal cases for its conclusion that: "Neither was it necessary for the arbitral award to mirror the department's arguments in order to provide Listro with sufficient notice." See *TiVo, Inc.* v. *Goldwasser*, 560 Fed. Appx. 15, 21 (2d Cir. 2014) (argument that arbitration panel exceeded authority because panel's reasoning "did not wholly track the parties' arguments" meritless); *Rosati* v. *Bekhor*, 167 F. Supp. 2d 1340, 1345 (M.D. Fla. 2001) ("[T]he general issue submitted to the arbitration panel was securities fraud. While the specific law mentioned in the [a]ward was not submitted to the arbitrators, the issue of securities fraud was submitted." [Emphasis omitted.]). Both cases are easily distinguishable from the present case on numerous grounds. First, neither case involves the dismissal of a public employee nor the notice of charges required before the arbitration commences. Second, in *TiVo, Inc.* v. *Goldwasser*, supra, 20, the United States Court of Appeals for the Second Circuit noted that one of the reasons that the arbitrator's decision was not fundamentally unfair was because the arbitrator, after the hearing, but before the final decision, had requested briefing on "whether the situation underlying arbitration was contemplated by the parties at the time they negotiated and executed the [patent licensing agreement]." (Internal quotation marks omitted.) The Second Circuit opined that "[b]ecause TiVo, [Inc.] did not request—and therefore the arbitration panel did not refuse—an opportunity to reopen the record to answer this inquiry, and the evidence needed to answer this inquiry is substantially the same as that needed to combat the arbitration panel's ultimate reliance on the covenant of good faith and fair dealing, the proceeding was not fundamentally unfair." Id. "Moreover, no additional notice was necessary to assure fundamental fairness because the covenant of good faith and fair dealing is in aid and furtherance of other terms of the agreement of the parties." (Internal quotation marks omitted.) Id. Therefore, because the court considered the doctrine of the implied covenant of good faith and fair dealing to be part of the contract theory there was not a due

process problem. Third, in *Rosati* v. *Bekhor*, supra, 1345, the court decided that, because the subject of the arbitration was securities fraud, the parties were on notice that any section of securities law involving fraud could be used in the arbitration. Fourth, in my view, *Rosati* would have had a different result if the arbitrator had considered a doctrine which was not part of securities fraud, such as negligence in the handling of securities. Likewise, *TiVo, Inc.*, may have reached a different result if the arbitration panel had considered a doctrine that was not part and parcel of the law of contracts, such as negligent misrepresentation.

In the present case, Listro was notified that she was being discharged due to the seriousness of her conduct, which allegedly resulted in the death of a child. Her hearing and termination letters both referenced the criminal charges against her, which were risk of injury to a child and first degree manslaughter. The state's position in the criminal trial was that Listro had caused M's "shaken baby syndrome," which resulted in the death of M. Because those criminal charges were referenced in her hearing and termination letters, it was reasonable to assume that the same theory was the basis for her discipline and termination. Indeed, this was the only basis upon which both the state and the department could proceed because the medical examiner, the only medical witness who offered an opinion on the matter, had stated that the cause of death was consistent with "shaken baby syndrome," and was not consistent with a fall from a bed. The arbitrator ruled in Listro's favor on this issue. None of the cases cited by the majority involve a situation wherein the arbitrator finds in favor of the employee on the principal issue, but then rules against the employee on an issue never raised by the parties and not within the scope of the arbitration.

The majority further posits, without citation, that "Listro was clearly informed that the arbitrator would consider whether her conduct on the night of May 19, 2008, constituted just cause for termination. The initial notice provided to Listro stated that an investigatory interview would be held to 'discuss [her] serious off-duty misconduct that has [led] to [her] arrest,' and the termination letter explained that the decision to dismiss her was made in light of the fact that M had died while in her care. The termination letter further noted that Listro's arrest warrant 'indicates that [she] provided a statement reporting that [M] had fallen from the bed when [Listro] left him unattended while [she] ejected a tape from [a] VCR.' Listro's own account of the events immediately preceding M's death in response to these charges provided the basis for the arbitrator's decision. Although Listro did not concede that she had been negligent, this was a legal conclusion that the arbitrator was free to draw from her testimony, one that is not subject to review by this court. Therefore, Listro was

provided with sufficient notice to satisfy her right to due process and the notice provision of the collective bargaining agreement." (Footnote omitted.)

I respectfully disagree. In my view, the majority opinion substantiates its decision on the basis of the general nature of the description of Listro's conduct. This is akin to saying that, because the background of an accident was adequately described in a civil complaint, a plaintiff can recover for both intentional conduct and negligence, even if only intentional conduct has been alleged, because the defendant should be on notice of the general factual background of the accident. In my view, this analysis completely ignores the requirements of due process.

It is undisputed that Listro has a constitutionally protected property interest in her employment with the department stemming from the collective bargaining agreement and its requirement that she only be removed for just cause. "Generally speaking, courts have recognized a property interest if, by statute, rule or contract, express or implied, the employee can only be fired for 'cause' . . . ." *Ventetuolo* v. *Burke*, 470 F. Supp. 887, 891 (D.R.I. 1978), aff'd, 596 F.2d 476 (1st Cir. 1979). As the United States Supreme Court explained in *Board of Education* v. *Loudermill*, supra, 470 U.S. 546, "[t]he essential requirements of due process . . . are notice and an opportunity to respond. The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement." The United States Supreme Court explained that "[t]he tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." Id. The United States Supreme Court further reasoned that "the pretermination 'hearing,' though necessary, need not be elaborate." Id., 545. In *Loudermill*, state law provided that the employee was entitled to a full administrative hearing and judicial review, so the United States Supreme Court only considered what procedural protections were required before termination. Id.

In *Bartlett* v. *Krause*, supra, 209 Conn. 353, this court considered the process for removing a fire marshal from his or her position under General Statutes § 29-300. In *Bartlett*, this court recognized, that "[t]he United States Supreme Court and other courts have often said that due process is flexible and calls for such procedural protections as the particular situation demands." (Internal quotation marks omitted.) Id., 369. In examining the procedural protections required under the facts of *Bartlett*, this court explained that "the answer as to what process is due in this case is not, as the defendants claim, to be found in the express language of the Connecticut statutes." Id. Instead, "[t]he need for procedural safeguards that due process guarantees in this

case goes beyond the notice and opportunity ('right to respond') language of § 29-300 . . . ." Id., 378.

In *Bartlett*, this court first concluded that the plaintiff had a property interest in her employment as a fire marshal because the state statute provided that the fire marshal could only be terminated for " 'cause.' " Id., 367; see also General Statutes § 29-297 ("[e]ach local fire marshal shall be sworn to the faithful performance of his duties by the clerk of the town, city, borough or fire district and shall continue to serve in that office until removed for cause"). On the basis of the fact that "[b]oth parties knew and expected that she would continue her employment as fire marshal until 'removed for cause,' " this court concluded that the plaintiff "has a property interest that is protected by due process." *Bartlett* v. *Krause*, supra, 209 Conn. 367. This court further reasoned that "[o]nce it is determined that due process applies, the question remains what process is due. . . . It is crucial to note that the right to due process is conferred not by legislative grace, but by constitutional guarantee. While the legislature may elect not to confer a property interest in [public] employment, it may not constitutionally authorize the deprivation of such an interest, once conferred, without appropriate procedural safeguards. . . . The United States Supreme Court and other courts have often said that due process is flexible and calls for such procedural protections as the particular situation demands." (Citations omitted; internal quotation marks omitted.) Id., 369.

Although this court recognized that *Loudermill* mandated that "when a property interest in continued public employment is created . . . the government must take an additional step, that of a pretermination hearing," it also recognized that the due process protections that were found to pass constitutional muster in *Loudermill*, might not be sufficient in *Bartlett*. Id., 376. Specifically, this court recognized in *Bartlett* that, unlike the statutory scheme at issue in in *Loudermill*, the statutory scheme for fire marshals in this state did not provide for any posttermination administrative procedures. Id., 373–74. Recognizing that "the existence of [posttermination] procedures is relevant to the necessary scope of [pretermination] procedures"; (internal quotation marks omitted) id., 374; this court had to decide "what kind of pretermination hearing, given the Connecticut statutory scheme, complies with the constitutional command of due process." Id., 376.

In *Bartlett*, this court concluded that the plaintiff was entitled to the following procedural safeguards prior to her dismissal: "First, notification in writing of the specific grounds for the proposed dismissal. Second, the meaningful opportunity to be heard in her own defense, personally or by counsel, at a public hearing, before the defendants have the power of dismissal. This

meaningful opportunity includes not only the production at the public hearing, by the defendants, of the person or persons whose complaints form the basis of the ground or grounds in the notification of grounds for potential dismissal, but also the opportunity to examine at that time any or all of these complainants should the plaintiff decide to do so. Third, a statement, oral or in writing, of the reason or reasons upon which the defendants premise termination if that is the sanction imposed." Id., 380–81.

Although I recognize that the procedural protections required in a particular situation are flexible, I think that *Bartlett* is instructive in the present case. In that case, this court explained that "[t]he 'opportunity to be heard in [her] own defense' ought, when procedural due process is factored in, to mean that the plaintiff had the opportunity, at least, to examine the persons who were the complainants of the various charges proffered against her. In addition, there is no record of the defendants' decision of final termination except their conclusory determination of termination. While such a decision need not be in great detail, the complete absence of any statement of the reasons supporting that decision makes judicial review difficult." Id., 380.

In the present case, Listro was never given the opportunity to be heard in her own defense on the charge that her care of M was negligent. Indeed, the word negligence was never used in her notice of hearing or termination letter, or in her pretermination hearing pursuant to *Loudermill*. Without any reference to negligence in the hearing or termination letter, she could not have had an opportunity to respond to whether she was negligent in caring for M.

Instead, the notice of hearing and termination letters notified Listro that the department was considering taking action based on "her serious off-duty misconduct that has [led] to [her] arrest." The termination letter even referred to the arrest warrant. Clearly, Listro would never have been arrested for negligent conduct. She was arrested because of "shaken baby syndrome," which was alleged to have caused M's death. Indeed, this is the only conduct for which she could have been prosecuted because the medical examiner explicitly determined that M's fall was not consistent with the cause of death.

Although, unlike in *Bartlett*, the procedure for Listro's termination did provide for posttermination review of the department's decision by way of arbitration, I would conclude that this review was meaningless because the ground used as "just cause" for her termination in the arbitrator's decision—negligence—was never the focus at the underlying *Loudermill* hearing. Therefore, Listro was never given the opportunity to address negligence at the pretermination hearing and never had "an opportunity to present [her] side of the case [as it related to

negligence] to the official responsible for the discharge," which is the purpose of the pretermination hearing. *Bartlett* v. *Krause*, supra, 209 Conn. 376. Moreover, even during the arbitration proceeding, none of the parties addressed whether Listro's conduct constituted negligence. Therefore, Listro was never given the required "pretermination opportunity to respond, coupled with [posttermination] administrative procedures" on the issue of whether her conduct constituted negligence. *Board of Education* v. *Loudermill*, supra, 470 U.S. 547–48.

Further, the department has suggested, and the Appellate Court agreed, that it was sufficient for due process purposes that Listro was aware of the incident which gave rise to the charges. See *AFSCME, Council 4, Local 2663* v. *Dept. of Children & Families*, 142 Conn. App. 1, 13, 62 A.3d 1168 (2013). This proposition is directly contrary to federal precedent. In addressing the notice required for due process purposes, the United States District Court for the Western District of Louisiana has stated that "[a]t the very least though, it is clear that in [the Fifth Circuit] notice of the charges against the employee given at the [pretermination] hearing will suffice where there is a history of contact between the employer and employee that warns the employee that he will be terminated for the reasons given at the termination hearing." *Nunnery* v. *Bossier*, 822 F. Supp. 2d 620, 625 (W.D. La. 2011). In the present case, there was no such history of contact between the department and Listro regarding alleged negligence.

Likewise, in *Lizzio* v. *Dept. of the Army*, 534 F.3d 1376 (Fed. Cir. 2008), the United States Court of Appeals for the Federal Circuit addressed an issue similar to the one in the present case. In that case, the defendant removed the plaintiff from his employment as a special agent in the Major Procurement Fraud Unit of the Criminal Investigation Command because it determined that he had breached a last chance agreement that he had entered into with the defendant in settlement of a previous removal action. Id., 1377. "The last chance agreement contained a waiver of appeal rights. [The plaintiff] appealed his removal to the [Merit Systems Protection Board (board)]. Following a hearing on the issue of jurisdiction, the administrative judge . . . to whom the appeal was assigned issued an initial decision in which she held that the waiver of appeal rights in the last chance agreement was unenforceable. She did so after ruling that [the plaintiff] had established that he had not committed the breach of the last chance agreement asserted by the [defendant] in its [n]otice of [i]ntention to [i]nvoke the last chance agreement . . . . [The administrative judge] therefore reversed the removal action." (Citation omitted.) Id., 1377–78.

"The [administrative judge] concluded that [the plaintiff] had not breached the last chance agreement. . . .

Focusing upon the alleged breach cited by [the defendant] . . . the [administrative judge] concluded that, though 'rude and obnoxious,' [the plaintiff's] conduct could not have embarrassed the government and therefore did not justify invocation of the last chance agreement. . . . Thereafter, in response to the [defendant's] petition for review, rather than disturbing the [administrative judge's] finding that the [defendant] asserted in the notice of breach that [the plaintiff] breached the agreement by engaging in conduct embarrassing to the government or her finding that [the plaintiff's] conduct did not embarrass the government, the [b]oard relied upon a ground for breach different from the one found by the [administrative judge] to have been asserted by the [defendant] in the notice of breach. Thus, the [b]oard concluded that 'rude and obnoxious' behavior comprised 'misconduct' within the meaning of the last chance agreement and therefore justified the [defendant's] invocation of the agreement and removal of [the plaintiff] for his prior misconduct." (Citations omitted.) Id., 1384.

On appeal, the Federal Circuit vacated the plaintiff's removal. It concluded as follows: "In sum, the [b]oard erred when . . . it relied on a ground for breach of the last chance agreement—conduct on [the plaintiff's] part that was 'rude and obnoxious'—different from the ground found by the [administrative judge] to have been asserted by the [defendant] in the notice of breach— conduct on [the plaintiff's] part that was 'embarrassing' to the government, a finding not disturbed by the [b]oard. In so doing, the [b]oard deprived [the plaintiff] of due process. . . . We do so because the [b]oard rested [its decision] solely upon the ground that [the plaintiff] engaged in rude and obnoxious behavior. Among other things, it declined to review the [administrative judge's] finding that the [defendant] charged [the plaintiff] with breaching the last chance agreement by engaging in conduct that embarrassed the [defendant], or her finding that his conduct . . . did not embarrass the [defendant]." (Citations omitted.) Id., 1386.

Like the present case, although the two separate charges arose from the same incident, the fact that the plaintiff in *Lizzio* did not have notice of the second charge was sufficient to vacate the board's decision. While I recognize that *Lizzio* involved a result after trial before an administrative judge, as opposed to arbitration, the case is important because of its recognition that due process requires notice of the specific reasons for dismissal, even if those reasons arise out of the same set of facts. Likewise, in the present case, Listro did not have notice of the negligence claim, although it arguably arose out of the same set of facts. The reasons for termination of employment must be specific. Unquestionably, the notice provided Listro in the present case falls far below any traditional notion of due process. Any attempts to gloss the allegations for dis-

missal with the cloak of knowledge of the incident must fail because of the panoply of charges that can result from one set of circumstances.

In *Darien Education Assn.* v. *Board of Education*, 172 Conn. 434, 438–39, 374 A.2d 1081 (1977), this court held that it can examine the merits of an arbitration decision in considering whether the arbitrator has failed to abide by his or her obligation to remain within the scope of his authority under the submission. Moreover, this court has previously stated that an arbitration award must draw its essence from the terms of the contract, and that the arbitrator cannot simply, "dispense his own brand of industrial justice." (Internal quotation marks omitted.) *Hudson Wire Co.* v. *Winsted Brass Workers Union*, 150 Conn. 546, 553, 191 A.2d 557 (1963), quoting *United Steelworkers* v. *Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S. Ct. 1358, 4 L. Ed. 2d 1424 (1960).

In the present case, the question before the arbitrator was whether Listro was terminated for just cause. The reason for her termination thus becomes a critical item in the determination. In my view, Listro was terminated for the conduct that led to the serious charges against her, alleged actions that resulted in the unfortunate death of a young child. The notice of hearing and the termination letter sent to Listro support my understanding of this case. The department never asserted negligence as the reason for termination. Negligence is never mentioned in any notice to Listro. The arbitrator answered the question presented to her. She stated: "I must conclude that the [d]epartment has failed to carry its burden of establishing that . . . Listro committed the fatal abuse of which she was accused." Therefore, Listro was not terminated for just cause.

The arbitrator's remaining findings go far beyond the scope of the submission. Specifically, the arbitrator held that Listro had been negligent in her care of M when negligence was never an issue before the arbitrator and Listro was never given notice that negligence would be an issue. It certainly was never the basis for Listro's termination. Further, the arbitrator's statement that Listro's "moment of negligence had unusually serious consequences" is totally unwarranted, especially when the medical examiner testified that M's injuries were not consistent with the fall. Specifically on these two grounds, which serve as the basis for the arbitrator's decision, the arbitrator was offering her own brand of industrial justice and failed in her obligation to remain within the scope of the submission. "This additional analysis is conducted pursuant to such a claim because an arbitrator's award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award. . . . If, for exam-

ple, there was evidence that revealed that [the arbitrator] had reached his decision by consulting a [O]uija board, [it would] not suffice that the award conformed to the submission. . . . [I]n the face of such a claimed inconsistency, this court will review the award only to determine whether it draws its essence from the collective bargaining agreement." (Citations omitted; internal quotation marks omitted.) *Board of Education* v. *Local 818, Council 4, AFSCME, AFL-CIO*, 5 Conn. App. 636, 640, 502 A.2d 426 (1985). In my view, Listro was not only denied due process because she was never informed that she was terminated for negligence, but also because the arbitrator engaged in her own brand of industrial justice. The arbitrator found negligence, and then found that the negligence resulted in M's death when the medical evidence was to the contrary. The medical examiner testified that M's injuries were not consistent with the fall. The arbitrator exceeded her own authority by issuing her own charge against Listro—that charge being one of negligence. Further, there was no causation related to the negligence. The medical examiner testified that if M had hit his head, the autopsy should have revealed pooled blood under the scalp. It did not.

The submission was restricted in that it required that the award be consistent with the terms of the parties' collective bargaining agreement. Article 15, § 9 (c), of the parties' collective bargaining agreement states in relevant part: "The arbitrator shall have no power to add to, subtract from, alter, or modify this [a]greement . . . ." The award in the present case was not consistent with this provision of the contract between the parties. The parties could have framed the remedy section of the issue by stating the following question: If, not, what shall the remedy be? Instead, they specifically put the restriction that the arbitration award be consistent with the terms of the parties' collective bargaining agreement. Further, if the union had known that negligence was going to be an issue, the submission to the arbitrator may have been on different terms.

Further, I am surprised at the majority's statement that "[w]e note, however, that it would not be inconsistent for the arbitrator to conclude that M's fall due to Listro's inattention could have been the last straw on top of previously inflicted traumatic injuries that led to M's death, even if Listro was not responsible for those prior injuries."[3] This statement is completely at odds with the findings of the medical examiner that the fall was not consistent with the cause of death. Nor was there any testimony that the fall contributed, in any way, to the cause of death. For this court to conclude that it could have been the "last straw" in the process is to suggest that an arbitrator, or any court, could draw a contrary inference from testimony which does not support the proposition. How could any court draw an inference that this was the "last straw" in the sequence

of death, when the only medical testimony suggests that the fall was not related to the death? In my view, such a view is not only illogical, but contrary to our evidentiary jurisprudence.

For the foregoing reasons, I respectfully dissent from the majority opinion. Therefore, I would reverse the judgment of the Appellate Court and remand the case to that court with direction to affirm the judgment of the trial court vacating the award.

[1] I note that the State Board of Labor Relations and the Office of the Attorney General were also named as defendants, but are not parties to the present appeal.

[2] Although, it may have been a debatable subject to find that Listro was negligent, the undisputed medical evidence was that the fall was not consistent with the cause of death. Therefore, it was improper for the arbitrator to conclude that Listro's negligence caused M's death. Further, the department's own dismissal letter belies any relationship between M's death and M falling off the bed. The letter states: "[T]he medical examiner has deemed that the injury to [M] is not consistent with such a fall."

[3] The majority's citation to *Rua* v. *Kirby*, 125 Conn. App. 514, 516 n.2, 8 A.3d 1123 (2010); see footnote 11 of the majority opinion; actually reinforces my contention that there was no proof to support the arbitrator's decision and that, instead of an inference supporting the decision, the medical examiner's testimony suggested an opposite conclusion. The operable quote, omitted by the majority from its citation to *Rua*, is that "under [the eggshell plaintiff doctrine the plaintiff] still has to prove the nature and probable duration of the injuries sustained." (Internal quotation marks omitted.) Id. There was no such proof in the present case. Likewise, in *Rua*, the Appellate Court decided that the "eggshell plaintiff" charge was not warranted because "[t]he plaintiff did not present any evidence or pursue a line of questioning that would reasonably support a finding that the preexisting condition was aggravated by the accident. In fact, the plaintiff's questioning with respect to the preexisting condition was intended to show that it was the accident that had caused the plaintiff's radiculopathy and not the preexisting condition. We therefore reject the plaintiff's claim that the court improperly refused to charge the jury that the defendants must 'take the plaintiff as they find him' and conclude that the court acted well within its discretion when it refused to set aside the verdict." (Footnote omitted.) Id., 518–19.

In the present case, the arbitrator found that "[r]egarding the merits of the case, the record conclusively established that M was a victim of shaken baby syndrome. The medical examiner's testimony and the autopsy report were not challenged and the union offered not a scintilla of evidence to suggest an alternative diagnosis. The decisive question before us is not the manner of his death but who caused it, i.e., who shook M so hard as to give him injuries that in the end were fatal.

"If M fell as asserted by . . . Listro . . . nothing in the record establishes that such a fall could not have been the 'proverbial last straw' for earlier traumatic injuries. Although the autopsy revealed no external bruising, there is no evidence that a fall from two feet would cause such bruising in a seven month old baby." (Footnote omitted.) The arbitrator then noted that "[t]he [medical examiner] testified that if M had hit his head, the autopsy should have revealed pooled blood under the scalp. Because . . . Listro testified that she did not see M fall, she never claimed that he hit his head, other, softer body parts might not be expected to suffer such bruising." Finally, the arbitrator found that "there was no evidence regarding how much time could elapse between a severe shaking and such a fall in order to result in death shortly thereafter." By creating a causal connection between Listro's alleged negligence and the death of M, both the arbitrator and the majority have made a medical finding, in the absence of support from any medical evidence, that directly contradicts the only medical doctor who was credited by the arbitrator. Such a form of industrial justice should not stand. See *Hudson Wire Co.* v. *Winsted Brass Workers Union*, supra, 150 Conn. 553.